UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60149-CIV-DIMITROULEAS/SNOW

FREDDIE SPARKS, JR.

      Plaintiff,

      vs.

KIOLO KIJAKAZI ACTING,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits. The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation.

## I. PROCEDURAL HISTORY

The Plaintiff filed an application for disability benefits on February 16, 2019, alleging disability since January 5, 2019 as a result of back and knee pain, fibromyalgia, psoriatic arthritis and other impairments. The application was denied initially and upon reconsideration. The Plaintiff then requested a hearing, which was held before Administrative Law Judge Sylvia H. Alonso on June 26, 2020. The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied the Plaintiff's request

for review on September 1, 2020.  The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on October 5, 1959 and has a high school education.  On the date of the hearing he was 6' tall and weighed 300 pounds. His past work was as an assistant manager, home inspector, car salesman and receptionist.  He stopped working in January 2019.  (R:43-46, 76)

The medical record reflects that the Plaintiff presented to rheumatologist Kristin Chai, M.D. of Medical Associates of Tamarac on March 6, 2018.[1]  At this initial evaluation by Dr. Chai, the Plaintiff complained of fatigue and diffuse pain which traveled to different places in his body.  The Plaintiff had no joint swelling, but reported occasional swelling in his hands, hips and low back, as well as morning stiffness in his hands and feet.  The Plaintiff experienced stress, but did not suffer from anxiety or depression.  Dr. Chai diagnosed body mass index (BMI) 37.0-37.9, adult; fibromyalgia and insomnia.  She prescribed gabapentin and scheduled a start date on Flexeril.  (R:372-73)

On April 10, 2018, Dr. Chai amended her BMI diagnosis to 40.0-44.9, adult, and on June 12, 2018, she added a diagnosis of bilateral primary osteoarthritis of the knee.  On that date, she added Cymbalta to the Plaintiff's medications and administered a steroid injection into his left knee.  On June 18, 2018, Dr. Chai administered a steroid injection into the Plaintiff's right knee and was considering injections in the Plaintiff's shoulders and hips at a future date.  Dr. Chai gave the

---

1. The Plaintiff states in his motion papers that he began treatment with Dr. Chai in 2016, and the record indicates that Dr. Chai prescribed medications for the Plaintiff in that year.  Dr. Chai's notes also reflect that the Plaintiff first was seen for fibromyalgia on August 4, 2016. (R:352)  However, the earliest treatment note in the record from Dr. Chai is March 6, 2018.

Plaintiff another steroid injection in the right knee on November 7, 2018.  On that date, she noted that the Plaintiff was not getting relief from Cymbalta and gabapentin, and she substituted Elavil.. (R:361-371)

On February 14, 2019, Dr. Chai noted that the Plaintiff's fibromyalgia was uncontrolled and he was applying for disability.  On that date, the doctor administered a Monovisc® injection in the Plaintiff's left knee.  A Monovisc® injection to his right knee was performed on February 21, 2019.  In an addendum to her treatment note for March 27, 2019, Dr. Chai stated that based on test results, she was starting the Plaintiff on Arava for rheumatoid arthritis. (R:344-353)

On June 1, 2019, a consultative physical examination of the Plaintiff was performed by Clay Guynn, D.O.  The Plaintiff told Dr. Guynn that he could walk for one block on level ground and could feed and dress himself with assistance.  The Plaintiff stated that he had difficulty standing for 0-5 minutes, as well as lifting more than 10-25 pounds with either arm.  He related that he was able to drive a car for 5-15 minutes, but was unable to sweep, vacuum or mop the floor.  The Plaintiff could cook for 5-15 minutes at a time, but could not do dishes.  He was unable to shop for groceries, climb up stairs or do yard work.  The Plaintiff could write his name and turn a doorknob.  (R:387-88)

Dr. Guynn's physical examination of the Plaintiff revealed that he could ambulate without an assistive device, get up and out of a chair without difficulty and get on an off the examination table without difficulty.  Examination of the Plaintiff's spine and extremities showed no evidence of scoliosis or kyphosis, but there was spasm of the paraspinous muscles.  Straight leg raising tests were negative without pain.  The Plaintiff was not able to walk on his toes or heels, but could stand on his toes and his heels.  He had difficulty squatting and bending over to touch his toes.  The Plaintiff

3

could perform tandem heel walking, with difficulty.  Fine and gross manipulation and grip strength were normal.  Motor strength was 5/5 and sensation was intact in all extremities. (R:388-89)

The Plaintiff displayed tenderness over his lumbar spine, as well as over his bilateral knees, periscapular region, biceps, anterior thighs, plantar aspect of the feet, greater trochanters and forearms. Range of motion was normal in the Plaintiff's shoulders, elbows, wrists, hands, hips and ankles, but reduced in his cervical and lumbar spine and his knees.  Dr. Guynn noted joint abnormalities and swelling in the Plaintiff's hands.   Dr. Guynn's impressions were low back pain secondary to spondylosis without myelopathy; bilateral knee pain secondary to osteoarthritis status post knee arthroscopy; neck pain secondary to spondylosis without myelopathy; fibromyalgia; history of chronic incontinence; rheumatoid arthritis, and chronic fatigue with non-restorative sleep.  The doctor opined that the Plaintiff had limitations in standing and walking and could stand or walk for 1/3-2/3 of an 8-hour workday, had a limited ability to bend or stoop and could ambulate without difficulty and without an assistive device. (R:390-91)

On July 16, 2019, Debra Troiano, M.D., a state agency non-examining physician, completed a Residual Functional Capacity Assessment of the Plaintiff.  Dr. Troiano opined that the Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk or sit for 6 hours during an 8-hour workday, and had an unlimited ability within lift/carry restrictions to push/pull (including operation of hand and/or foot controls).  She believed that the Plaintiff had unlimited abilities to balance, stoop and crawl, but only occasionally could climb ramps/stairs, kneel or crouch, and never could climb  ladders/ropes/scaffolds.  The Plaintiff had unlimited abilities to reach in any direction, handle and feel, but was limited in his fingering (fine

4

manipulation) abilities in both hands.  The Plaintiff had no visual or communicative limitations, but had to avoid concentrated exposure to extreme heat and cold; humidity; fumes, odors, dusts, gases and poor ventilation, and hazards such as machinery and heights.  The Plaintiff did not need to avoid wetness, noise or vibration. On September 20, 2019, a second non-examining physician, reaffirmed Dr. Troiano's findings. (R:81-85, 94-97)

The Plaintiff returned to Dr. Chai on July 19, 2019.  At that time,  Dr. Chai noted nail pitting, and added a diagnosis  arthropathic  psoriasis, unspecified. She also noted "pencil in cup" deformities on x-rays of the Plaintiff's hands. On that date, Dr. Chai added sulfaslazine to the Plaintiff's medications and continued Arava. On October 2, 2019, Dr. Chai administered Monovisc® injections in both of the Plaintiff's knees. (R:590-600)

On October 24, 2019,  Dr. Chai completed a Medical Source Statement of Ability to Work-Related Activities (Physical) on behalf of the Plaintiff.  She opined that the Plaintiff could lift/carry 10 pounds occasionally; could sit for 30 minutes at a time and for a total of 7 hours during an 8-hour workday; stand for 10 minutes at a time and for a total of 1 hour during an 8-hour workday, and walk for 3 hours at a time and for 30 minutes during an 8-hour workday.[2]  Dr. Chai believed that the Plaintiff only occasionally could reach, handle, finger, feel, and push/pull with either hand, and frequently could push/pull with either foot.  He occasionally could balance, but never could climb stairs, ramps, ladders or scaffolds, stoop, kneel, crouch or crawl.  The Plaintiff had no visual or hearing impairments which would limit his ability to work, but did have environmental limitations: he only occasionally could be exposed to

_____

2. The walking restrictions are inconsistent and likely an error, since an individual who can walk for 3 hours at a time is not limited to a total of 30 minutes during an 8-hour workday.

moving mechanical parts, humidity and wetness and vibrations, and never be exposed to unprotected heights; dust, odors and pulmonary irritants, and extreme heat or cold. The Plaintiff occasionally could operate a motor vehicle and could tolerate moderate noise. As to activities of daily living, the Plaintiff was able to ambulate without using a wheelchair, walker or 2 canes or crutches; prepare simple meals and feed himself, and care for his personal hygiene, but could not go shopping; travel without a companion for assistance; walk for a block at a reasonable pace on uneven or rough surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail, or sort, handle or use paper/files. Regarding other work-related activities, Dr. Chai stated that the Plaintiff was not able to climb, sit or stand for long periods; had a loss of balance; was not able to kneel or stoop; had diminished ability to concentrate, and was chronically fatigued. She further stated that these limitations had been present since 2016. (R:485-90)

Dr. Chai ordered an MRI of the Plaintiff's cervical spine, which was performed on December 12, 2019. The radiologist listed the following impressions: straightening of normal cervical lordosis, suggestive of muscle spasm/strain; annular tearing, most prominent at C4-C5; degenerative disc disease and osteoarthritis of the spine; left lateral disc herniation at C3-C4 with extension of disc material inferiorly. cord effacement/compression, no central canal stenosis, left-sided neural foraminal narrowing; left paracentral/left lateral disc herniation at C4-C5 with extension of disc material inferiorly, cord effacement/compression, no central canal stenosis, left-sided neural foraminal narrowing; disc bulge at C5-C6, no central canal stenosis, and disc bulge or herniation at level T2-T3 and T3-T4 vertebrae with effacement of thecal sac and cord. (R:518-19)

On January 15, 2020, the Plaintiff presented to Behnam Myers, D.O., an orthopedic surgeon, reporting neck pain radiating to both extremities with numbness and tingling in hands; headaches; lower back pain radiating to both legs to the knees, and numbness in feet.  The Plaintiff explained that his back pain began following a football injury at the age of 17, and his neck pain started when a heavy wooden garage door fell on his head in 2017. Physical examination revealed normal range of motion, with pain, in the Plaintiff's lumbar and cervical spine; intact cranial nerves; normal muscle strength and sensation (except for decreased sensation on the left EHL) and negative straight leg raising, but a positive Tinel's test bilaterally.  Dr. Myers' assessment was cervicalgia; other cervical disc displacement, unspecified cervical region; lumbago with sciatica, left side, and lumbago with sciatica, right side.  The doctor did not suggest surgery, but did recommend physical therapy evaluation and treatment, as well as pain management treatment.  (R:553-58)

On January 30, 2020, the Plaintiff presented to Neil I. Kirschbaum, D.O., for a pain management consultation.  Physical examination of the Plaintiff's cervical, lumbar and thoracic spine revealed no edema, erythema or ecchymosis and no midline spinous process tenderness.  In the cervical spine, the Plaintiff had significant paravertebral muscle tenderness, as well as pain and restriction in range of motion; there was no paravertebral muscle tenderness in the Plaintiff's thoracic and lumbar spine.  However, in the lumbar spine, the Plaintiff had positive facet loading maneuvers bilaterally and pain and restriction in flexion and extension.  Motor strength was normal.  Dr. Kirschbaum's assessments were neck pain; low back pain; psoriatic arthritis; chronic nonmalignant pain, and muscle spasm.  He recommended bilateral cervical and lumbar trigger point injections.  (R:532-34)

The Plaintiff returned to Dr. Myers for follow-up on February 26, 2020. At that time, the Plaintiff stated that he continued to have neck pain radiating to both arms, as well as numbness and tingling in his hands. The Plaintiff also continued to have low back pain, radiating to his legs with numbness and tingling in his feet. The headaches also continued. The Plaintiff had been going to physical therapy at least twice per week, but some of the positions used hurt his neck. The Plaintiff also had developed weakness in his upper and lower extremities. Dr. Myers' findings on physical examination were the same as in the January visit. He instructed the Plaintiff to stop physical therapy and obtain an updated MRI of his cervical spine. The doctor noted that the Plaintiff had an appointment for pain management, but told the Plaintiff to hold off on receiving injections until he obtained the MRI results. (R:548-51)

A repeat MRI of the Plaintiff's cervical spine was performed on March 17, 2020, revealing: central/right paracentral disc herniation at C5-C6 measuring 10 x 5 mm, resulting in moderate spinal stenosis and indenting on the cord; central disc herniation at C7-T1, affecting the sac but not the cord, and uncovertebral and facet arthrosis resulting in moderate foraminal stenosis at C5-C6, as well as moderate to severe foraminal stenosis at C6-C7. An MRI of the Plaintiff's lumbar spine was performed on the same date, showing: central extruded disc herniation at L3-L4 measuring 11 x 5 x 7 mm, effacing the thecal sac without significant spinal stenosis; central/left paracentral extruded disc herniation at L4-L5 measuring 10 x 8 x 12 mm, compressing the ventral thecal sac, and spondylosis, facet arthrosis with superimposed left broad-based disc herniation at L5-S1, resulting in moderate left lateral recess stenosis and moderate bilateral foraminal stenosis of the left S1 and bilateral L5 nerve roots. (R:542, 544)

On April 8, 2020, the Plaintiff returned to Dr. Myers to review the MRI results. The Plaintiff stated that his primary complaint was lower back pain. He no longer was experiencing weakness in his arms. When his back pain was severe, it radiated down his right leg, but not the left. The results of Dr. Myers' physical examination were the same as in the preceding two visits. At this time, the doctor recommended surgery, specifically an anterior lumbar arthrodesis (fusion). (R:564-69)

At the administrative hearing, the Plaintiff testified that he stopped working because his fibromyalgia and arthritis had worsened to the point that he could no longer help his son in the home inspection business the Plaintiff had started. The Plaintiff had gained about 50 pounds during the preceding few years, from the time he began taking steroids. His most serious health problem was fibromyalgia and rheumatoid arthritis. The Plaintiff acknowledged that he began treatment with Dr. Chai in 2018, but explained that he had been treated since 2016 by her brother and father, both of whom were in the same medical practice. The Plaintiff stated that he was diagnosed with fibromyalgia in 2016 and with rheumatoid arthritis in 2018. Within the past several months he also had been diagnosed with psoriatic arthritis. (R:46-48)

The Plaintiff testified that he also suffered from back and knee pain following knee operations; herniated discs in his neck and lower back, as well as arthritis in his joints and spine. He experienced migraines 2-3 times per month, each lasting 8-10 hours. The Plaintiff stated that the psoriatic arthritis was affecting his hands to the extent that he was barely able to hold a pen, and also affected his middle back. The Plaintiff rated his back pain as 8-9 on a scale of 1-10; he rated his neck pain as 5-6 when lying down, increasing to 8-9 when sitting up. (R:49-51)

Regarding his activities of daily living, the Plaintiff testified that he needed help from his wife to shower approximately half of the time; could prepare very simple meals such as scrambled eggs or cereal, but could not shop for groceries. He did not do any household chores other than occasionally folding clothes. The Plaintiff no longer engaged in social activities. He related that he sometimes used knee braces and/or a cane to help him walk. He could walk for about 150 feet and sit for about 30 minutes at a time. The Plaintiff could lift and carry about 10 pounds. He went to bed at about 9:30 p.m. and got up at about 6:30 a.m., and often took naps during the day.(R:51-54)

Lorin Lovely, a vocational expert (VE) testified that the Plaintiff's past jobs as assistant manager, car salesman and building inspector are classified as light work, while his work as receptionist at the home inspection company is classified as sedentary. The VE was asked to consider a hypothetical individual of the same age, education and work experience as the Plaintiff who could perform the full range of light work, except that he could stand/walk or sit for 6 hours during an 8-hour workday; occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; occasionally kneel, crouch and crawl; frequently handle and finger with bilateral upper extremities; could tolerate occasional exposure to extreme cold, heat, humidity, fumes, dust, and gases, but could never be exposed to hazards. The VE testified that such an individual could perform the Plaintiff's past jobs as assistant manager, car salesman and receptionist. (R:56-59)

Counsel for the Plaintiff asked the VE to consider an individual who could lift no more than 10 pounds; sit for 7 hours during an 8-hour workday; stand for 10 minutes at a time and for a total of 1 hour; walk for 30 minutes at a time and for a total of 3 hours; bilaterally reach overhead and in all directions; handle, finger, feel,

push, pull and frequently use foot controls; never climb, stoop, crouch or crawl or climb ladders, ramps or scaffolds; occasionally balance and tolerate exposure to moving mechanical parts, humidity, wetness and vibrations; could occasionally operate a motor vehicle, and tolerate no exposure to unprotected heights, pulmonary irritants or extreme temperatures. The VE testified that such a person could perform the Plaintiff's past job of receptionist. (R:59-60)

The VE testified that there are no jobs for a person who would be absent from work for more than 1 day per month or was off-task for more than 10% of the time. However, if the hypothetical individual was required to stand every 30 minutes and was not required to walk away from the workstation, this would not be considered off-task since he still could answer the phone while standing. In response to a question posed by the ALJ, the VE testified that because the Plaintiff's job as an assistant manager required him to drive a forklift occasionally, the individual in the hypothetical posed by the ALJ could not do the job as the Plaintiff actually performed it, but could do it only as it generally is performed in the national economy. (R:60-62)

At the conclusion of the hearing, counsel for the Plaintiff asked the ALJ to submit an interrogatory (presumably to a medical expert) to ascertain whether the Plaintiff's degenerative disc disease met a listed impairment, based on the results of the Plaintiff's most recent MRIs, both of which showed nerve root compression. Counsel noted that based on these results, the Plaintiff's orthopedist had recommended surgery. The ALJ responded that the record was closed and denied the request. (R:62-63)

## III. <u>DECISION OF THE ALJ</u>

The ALJ first found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2023; had not engaged

in substantial gainful activity since his alleged onset date of January 5, 2019, and had the severe impairments of degenerative disc disease; degenerative joint disease of the left knee; fibromyalgia; psoriatic arthritis; chronic obstructive pulmonary disease (COPD); hypertension, and obesity.  However, the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ's residual functional capacity assessment of the Plaintiff was that he could perform the full range of light work, except that he could sit for 6 hours during an 8-hour workday; stand/walk for 6 hours during that time period; occasionally climb ramps and stairs, but never climb ladders, ropes or scaffold; occasionally kneel, crouch and crawl; frequently handle and finger with the bilateral upper extremities; occasionally tolerate exposure to extreme heat and cold, humidity, fumes, dusts and gases, and tolerate no exposure to hazards.  (R:18-21)

In support of this residual functional capacity assessment, the ALJ first summarized the Plaintiff's hearing testimony and allegations made in his pre-hearing brief (R:21-22).  The ALJ determined that although the Plaintiff's medically determinable impairments reasonably could be expected to cause the symptoms he alleged, the Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (R:22)

While acknowledging that the medical record demonstrated that the Plaintiff suffered from degenerative disc disease, degenerative joint disease of the left knee, fibromyalgia and psoriatic arthritis, the ALJ emphasized the following facts: (1) in June 2019, the Plaintiff stated that his hand swelling occurred only occasionally, he had no difficulty turning a doorknob with both hands, did not use an assistive device

and was able to walk 1 block on level ground; (2) in October 2019, the Plaintiff reported improvement of his pain after taking viscosupplements; (3) in January 2020, the Plaintiff denied radiation of his neck pain to his arms and stated that radiation of back pain to his right lower extremity occurred only occasionally; (4) following a pain management evaluation in January 2020, lumbar and cervical injections were recommended; (5) in April 2020, the Plaintiff denied weakness in his arms, said he was not dropping anything and denied gait abnormalities; (6) the Plaintiff had less than one medical appointment per month with Dr. Chai, whose treatment notes did not reflect significant medication adjustments or repeated demonstrations of significantly abnormal functioning: (7) although Dr. Myers recommended lumbar surgery in April 2020, the Plaintiff repeatedly had displayed full lumbar range of motion as well as full strength and sensation in his lower extremities, and Dr. Myers did not recommend surgical intervention for the Plaintiff's cervical spine, and (8) the Plaintiff took only over-the counter medications for migraines.  (R:22-23)

The ALJ also acknowledged that during the consultative examination by Dr. Guynn, the Plaintiff exhibited paraspinal muscle spasms, swelling and joint abnormalities in his bilateral hands, as well as limited range of motion in his cervical spine, lumbar spine and knees.  The Plaintiff also had difficulty bending and declined to squat based on fear of falling.  The ALJ noted, nonetheless, that the Plaintiff was able to get up and out of a chair and to get on and off the examination table without difficulty and ambulated normally without an assistive device.  Additionally, the Plaintiff had negative bilateral straight leg raise tests; could tandem walk with difficulty; could stand on his toes and heels; could tandem walk with difficulty; had normal bilateral grip strength and full bilateral fine and gross manipulative skills;

displayed full strength and sensation in the upper portions of his lower extremities, and had full range of motion in all extremities. (R:23)

The ALJ conceded that during the pain management evaluation of the Plaintiff in January 2020, the Plaintiff displayed paravertebral muscle tenderness with painful and limited range of motion in his lumbar and cervical spines. Nevertheless, the ALJ pointed out that the Plaintiff displayed full motor strength in his lower extremities, as well as intact sensation and reflexes in all extremities. Similarly, during an examination by Dr. Myers that same month, the Plaintiff exhibited painful lumbar and cervical range of motion; limited cervical rotation bilaterally; positive bilateral Tinel's sign; decreased patellar and extensor hallucis longus reflexes, and a diminished sensation in his right exterior hallicus longus. The ALJ noted that in spite of these findings, the Plaintiff displayed full cervical and lumbar range of motion; full strength in his upper extremities, including full grip strength, and otherwise full sensation and reflexes in all extremities. The Plaintiff also had negative straight leg tests and a normal gait. The ALJ also assessed that the Plaintiff's COPD, hypertension and psychiatric problems did not significantly impact his ability to work. (R:23-24)

The ALJ stated that she was persuaded by the opinions of the non-examining state agency physicians because they were consistent with the Plaintiff's symptomatic denials and reports of occasional symptoms; reported improvement with a viscosupplement; generally conservative treatment from his primary care physician; general lack of emergency treatment for hypertension and COPD; lack of earnest discussion concerning surgery for obesity; lack of recommendation for surgery on his cervical spine; normal and nearly normal pulmonary function test results, and demonstrations of normal and nearly normal physical functioning. The ALJ further stated that she was generally persuaded by Dr. Guynn's opinion to the extent it was

14

consistent with the ALJ's residual functional capacity assessment and the opinions of the state agency consultants.  However, Dr. Guynn's determination that the Plaintiff had a limited ability to bend or stoop was inconsistent with the Plaintiff's demonstrated abilities to get up and out of a chair and to get on and off an examination table without difficulty.  Moreover, Dr. Guynn's assessment was vague and did not state the Plaintiff's maximum functional capability with regard to bending or stooping. (R:24-25)

The ALJ stated that she was not persuaded by Dr. Chai's opinion because, despite the doctor's lengthy treatment relationship with the Plaintiff,  her assessment was overstated and not supported by her treatment notes or the objective evidence in the record.  The ALJ found that Dr. Chai's treatment notes did not show repeated significant medication adjustments or repeated demonstrations of significantly abnormal functioning, and was inconsistent with the findings of the state agency consultants and Dr. Guynn.  The ALJ also noted that Dr. Chai's opinion was inconsistent with the lack of repeated demonstrations of significant psychiatric abnormalities, together with the Plaintiff's statements that his inability to work was the result of physical rather than mental problems.  Finally, the ALJ stated that the doctor's opinion was rendered less persuasive because she opined that the Plaintiff was disabled as of 2016, but the record shows that she did not actually begin treating the Plaintiff until March 2018, and the Plaintiff worked during the period of 2016 to 2018. (R:25)

Based on the testimony of the VE, the ALJ determined that the Plaintiff was capable of performing his past relevant work as an assistant manager, as it is generally performed, and his past jobs of car salesman and receptionist, as those jobs are generally performed and as the Plaintiff actually performed them.  The ALJ stated

that she had verified that the VE's testimony was consistent with the DOT.  The ALJ emphasized that the VE testified that an individual possessing the limitations described in Dr. Chai's opinion could perform the job of receptionist.  Accordingly, the ALJ concluded that the Plaintiff was not under a disability as defined by the Social Security Act during the time period of January 5, 2019 through the date of the decision.

## IV. <u>CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

The Plaintiff seeks reversal or remand on the grounds that the ALJ failed to properly evaluate (1) the medical opinion evidence and (2) the Plaintiff's subjective allegations of pain.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. <u>RECOMMENDATIONS OF LAW</u>

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence.  "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1985).  Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389 (1971); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233 (11th Cir. 1983).  The Court must review the record as a whole to determine if the decision is supported by substantial evidence. <u>Bloodsworth</u>, 703 F.2d at 1239.  The Court must also determine whether the

16

Administrative Law Judge applied the proper legal standards.  No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied.  <u>Davis v. Shalala</u>, 985 F.2d 528, 531 (11th Cir. 1993) (citing <u>Bridges v. Bowen</u>, 815 F.2d 622, 624 (11th Cir. 1987)).

      In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520.  First the claimant must not be engaged in substantial gainful activity after the date the disability began.  Second, the claimant must provide evidence of a severe impairment.  Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to  perform such work.

## A. <u>Evaluation of Medical Opinions</u>

      The Plaintiff argues that the ALJ failed to give proper credit to Dr. Chai's opinion; improperly based her decision on the opinions of the state agency non-examining physicians, and failed to properly consider the Plaintiff's spinal impairments by denying the Plaintiff's request for an additional expert testimony based on the Plaintiff's most recent MRI results.  For claims filed after March 27, 2017, 20 C.F.R. § 1520c(a) provides that no deference or specific evidentiary weight,

including controlling weight, is to be given to any medical opinion or prior administrative finding, including those of a treating source. Instead, each opinion or prior finding is evaluated by considering the factors set forth in § 1520c(c): (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of treatment relationship and examining relationship; (4) specialization, and (5) other factors, such as familiarity with the other evidence in the claim or an understanding of the program's policies and evidentiary requirements. Of these factors, the most important are supportability and consistency.

Regarding Dr. Chai's opinion, the undersigned notes that the ALJ provided a number of specific reasons why it was not persuasive: Dr. Chai's treatment notes did not show repeated significant medication adjustments or repeated demonstrations of significantly abnormal functioning; the opinion was inconsistent with the findings of the state agency consultants and Dr. Guynn, and the opinion also was inconsistent with the lack of repeated demonstrations of significant psychiatric abnormalities as well as the Plaintiff's statements that his inability to work was the result of physical rather than mental problems. The ALJ also was influenced by the fact that Dr. Chai had opined that the Plaintiff was disabled as of 2016, while the record showed that she had not actually begun treating the Plaintiff until March 2018, and that the Plaintiff still was working during the period of 2016 to 2018. However, this Court need not determine whether the ALJ properly evaluated Dr. Chai's opinion because, as the ALJ pointed out, the VE testified that an individual with the limitations listed by Dr. Chai could perform the Plaintiff's past relevant work as a receptionist. As a result, the Plaintiff suffered no prejudice from the ALJ's failure to fully credit Dr. Chai's opinion.

A more difficult question is whether the ALJ should have granted the Plaintiff's request for submission of an interrogatory to a medical expert based on the Plaintiff's most recent MRI results, which were obtained shortly before the administrative hearing.  The undersigned notes that these results were from an updated MRI of the Plaintiff's cervical spine as well as the only MRI of the Plaintiff's lumbar spine that appears in the record.  Based on this lumbar MRI, Dr. Myers recommended that the Plaintiff undergo surgery.  Presumably, the condition of the Plaintiff's lumbar spine, which was not known to Dr. Chai at the time she completed her physical residual functional capacity assessment, would have impacted her determination that the Plaintiff could sit for 7 hours during an 8-hour workday.

It is well-established that the ALJ has a basic duty to develop a full and fair record.  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. § 416.912(d). "Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." Ellison, 355 F.3d at 1276; 20 C.F.R. § 416.912(a).  A consultative examination is ordered "to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient" to make a determination or decision" on a claim. 20 C.F.R. § 1519a(b).  An ALJ is not obligated to seek independent, additional expert medical testimony where information in the record is sufficient for a decision.  Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).  Moreover, a plaintiff must demonstrate prejudice resulting from the ALJ's failure to develop the record before remand is required. See Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997).

In the instant case, the ALJ gave no reason for her refusal to grant the Plaintiff's request to develop the record with respect to the impact on the Plaintiff's residual functional capacity of the most recent MRI results.  The only comments in the

19

ALJ's decision relating to Dr. Myer's recommendation of lumbar surgery were that the Plaintiff repeatedly had displayed full lumbar range of motion as well as full strength and sensation in his lower extremities, and Dr. Myers had not recommended surgery on the Plaintiff's cervical spine. Dr. Myer's decision not to recommend surgery on the Plaintiff's cervical spine is not material to the issue of whether the Plaintiff's residual functional capacity was affected by the condition of his lumbar spine. During Dr. Myers' examinations, the Plaintiff did display full lumbar range of motion, but with pain, and the Plaintiff told Dr. Myers that his primary complaint was of low back pain.

The Commissioner responds that it is the Plaintiff's burden to prove disability, and the ALJ is not required to make the Plaintiff's case for him. However, the Plaintiff did present evidence to support his complaint of disabling low back pain in the form of the March 2020 MRI results and the report of Dr. Myers' April 2020 examination, which included the doctor's recommendation of lumbar surgery. None of the physicians who issued medical opinions: Dr. Chai, Dr. Guynn or the two state agency consultants, had the benefit of this evidence before issuing their opinions. and the ALJ did not have the expertise required to assess the impact, if any, of the new evidence on those opinions.

Accordingly, the undersigned finds that the ALJ erred by not granting the Plaintiff's request to supplement the record with a medical opinion as to the effect of the 2020 MRI results on the Plaintiff's residual functional capacity. On remand, the ALJ should develop the record by ordering a second consultative examination of the Plaintiff and/or obtaining the testimony of a medical expert on the issue.

### B. Plaintiff's Allegations of Pain

The Plaintiff also argues that the ALJ failed to properly credit his subjective testimony and other allegations relating to the disabling effects of his pain

and other symptoms.   The ALJ must consider a claimant's subjective testimony regarding pain if he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain.  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992); Mason v. Bowen, 791 F.2d 1460, 1462 (11th Cir. 1986); Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).  However, the ALJ may reject a claimant's testimony regarding pain, and that determination must be upheld if it is supported by substantial evidence. Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984).

In the instant case, the ALJ provided detailed reasons for not fully crediting the Plaintiff's  statements regarding pain and other limitations.  However, as discussed above, the record did not contain any medical assessment which took into account the Plaintiff's March 2020 MRI results and Dr. Myers' April 2020 treatment notes.  Therefore, the ALJ should, on remand, evaluate the Plaintiff's subjective allegations in light of the evidence obtained by the ALJ to develop the record on this issue.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Summary Judgment be GRANTED, in part, and that the case be remanded to the Commissioner for development of the record on the issue of the impact on the Plaintiff's residual functional capacity assessment of the Plaintiff's March 2020 MRI results and Dr.

Myers' April 2020 treatment report, and that the Defendant's Motion for Summary Judgment be DENIED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with  the Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice.  <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 14th day of December, 2021.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record